No. 22-10560

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

STATE OF TEXAS; STATE OF MISSISSIPPI; STATE OF LOUISIANA,

Plaintiffs-Appellees,

v.

JANET YELLEN, in her official capacity as Secretary of the Treasury; RICHARD K. DELMAR, in his official capacity as Acting Inspector General of the Department of the Treasury; UNITED STATES DEPARTMENT OF THE TREASURY; UNITED STATES OF AMERICA,

Defendants-Appellants.

On Appeal from the United States District Court
for the Northern District of Texas

## BRIEF FOR APPELLANTS

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

CHAD E. MEACHAM
*United States Attorney*

MARK B. STERN
ALISA B. KLEIN
DANIEL WINIK
*Attorneys, Appellate Staff*
*Civil Division, Room 7245*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-8849*

## CERTIFICATE OF INTERESTED PERSONS

No. 22-10560

STATE OF TEXAS; STATE OF MISSISSIPPI; STATE OF LOUISIANA,

Plaintiffs-Appellees,

v.

JANET YELLEN, in her official capacity as Secretary of the Treasury; RICHARD K. DELMAR, in his official capacity as Acting Inspector General of the Department of the Treasury; UNITED STATES DEPARTMENT OF THE TREASURY; UNITED STATES OF AMERICA,

Defendants-Appellants.


Under Fifth Circuit Rule 28.2.1, defendants—as governmental parties—need not submit a certificate of interested persons.

*/s/ Daniel Winik*
Daniel Winik

## STATEMENT REGARDING ORAL ARGUMENT

The federal government respectfully requests oral argument. The district court permanently enjoined the federal government from enforcing against the three plaintiff States a provision of the American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 Stat. 4, that prohibits a State from using the new federal funds provided by the Act to offset a reduction in the State's net tax revenue. Oral argument is warranted given the importance of the issue.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ....................................................i

STATEMENT REGARDING ORAL ARGUMENT ......................................................ii

TABLE OF AUTHORITIES ................................................................iv

STATEMENT OF JURISDICTION.......................................................1

STATEMENT OF ISSUES ................................................................1

STATEMENT OF THE CASE ................................................................2

     A.     Statutory Background...................................................................2

     B.     Implementing Regulations..............................................................3

     C.     This Action ...................................................................4

SUMMARY OF ARGUMENT ................................................................5

STANDARD OF REVIEW................................................................7

ARGUMENT .....................................................................7

I.     PLAINTIFFS FAILED TO SUBMIT EVIDENCE DEMONSTRATING A CONCRETE CONTROVERSY OVER THE OFFSET PROVISION'S CONSTITUTIONALITY ................................................................7

II.     THE OFFSET PROVISION IS NOT IMPERMISSIBLY COERCIVE AND DOES NOT VIOLATE THE ANTI-COMMANDEERING DOCTRINE ................................. 11

CONCLUSION ................................................................ 15

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                                          **Page(s)**

*Arizona v. Yellen,*
   34 F.4th 841 (9th Cir. 2022) ................................................................. 10

*Bennett v. Kentucky Department of Education,*
   470 U.S. 656 (1985) ............................................................................ 14

*Cheek v. United States,*
   498 U.S. 192 (1991) ........................................................................... 6, 9

*Crowell v. Benson,*
   285 U.S. 22 (1932) ................................................................................ 9

*Davidson v. Georgia-Pacific, LLC,*
   819 F.3d 758 (5th Cir. 2016) ................................................................. 9

*Gruver v. Louisiana Board of Supervisors for the Louisiana State Univ. Agric. & Mech. Coll.,*
   959 F.3d 178 (5th Cir. 2020) ............................................................... 13

*Jennings v. Rodriguez,*
   138 S. Ct. 830 (2018) ............................................................................ 9

*Mayhew v. Burwell,*
   772 F.3d 80 (1st Cir. 2014) ................................................................. 14

*Med-Cert Home Care, LLC v. Becerra,*
   19 F.4th 828 (5th Cir. 2021) ................................................................. 7

*Mississippi Commission on Environmental Quality v. EPA,*
   790 F.3d 138 (D.C. Cir. 2015) ............................................................. 13

*Missouri v. Yellen,*
   39 F.4th 1063 (8th Cir. 2022) ................................................ 4, 5, 8, 9, 14

*Moore v. Brown,*
   868 F.3d 398 (5th Cir. 2017) ................................................................. 8

*National Federation of Independent Business v. Sebelius,*
   567 U.S. 519 (2012) ...................................................................... 7, 11, 12

*Sabri v. United States,*
   541 U.S. 600 (2004) ............................................................................ 12

*South Carolina Department of Education v. Duncan*,
714 F.3d 249 (4th Cir. 2013) ............................................................ 14

*South Dakota v. Dole*,
483 U.S. 203 (1987) ........................................................................ 12

*Texas v. Yellen*,
2022 WL 1063088 (N.D. Tex. Apr. 8, 2022) ................................ 5, 7, 11, 14

**Statutes:**

28 U.S.C. § 1291 ................................................................................ 1

28 U.S.C. § 1331 ................................................................................ 1

American Rescue Plan Act of 2021,
Pub. L. No. 117-2, 135 Stat. 4 ........................................................... 2
    42 U.S.C. § 802 ........................................................................... 2
    42 U.S.C. § 802(a)(1) .................................................................. 1, 2
    42 U.S.C. § 802(b)(3)(A) .............................................................. 2
    42 U.S.C. § 802(c)(1) ................................................................... 2
    42 U.S.C. § 802(c)(2) ................................................................... 2, 13
    42 U.S.C. § 802(c)(2)(A) .............................................................. 1, 2
    42 U.S.C. § 802(c)(2)(B) .............................................................. 2
    42 U.S.C. § 802(d)(1) ................................................................... 3
    42 U.S.C. § 802(e) ....................................................................... 3
    42 U.S.C. § 802(f) ........................................................................ 3
    42 U.S.C. § 802(g)(1) .................................................................. 2

**Rule:**

Fed. R. App. P. 4(a)(1)(B) ................................................................... 1

**Other Authorities:**

*Coronavirus State and Local Fiscal Recovery Funds*,
86 Fed. Reg. 26,786 (May 17, 2021) .................................................. 3

*Coronavirus State and Local Fiscal Recovery Funds*,
87 Fed. Reg. 4338 (Jan. 27, 2022) ..................................................... 3, 4, 8

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331. ROA.15. The district court entered final judgment in plaintiffs' favor on April 8, 2022. ROA.1106-1107. The federal government timely appealed from that judgment on June 6, 2022. ROA.1108-1109; *see* Fed. R. App. P. 4(a)(1)(B). This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

The American Rescue Plan Act provided nearly $200 billion in federal grants to help States mitigate the fiscal effects of the COVID-19 pandemic. 42 U.S.C. § 802(a)(1). The Act gives States considerable flexibility in determining how to use these new federal funds but specifies that a State "shall not use the funds … to either directly or indirectly offset a reduction in the net tax revenue of such State" resulting from changes in state tax law during the covered period. *Id.* § 802(c)(2)(A) (the "Offset Provision"). The district court permanently enjoined the federal government from enforcing the Offset Provision against the three plaintiff States on the theory that it is unconstitutionally coercive and violates anti-commandeering principles. The questions presented are:

1.    Whether the district court's judgment should be vacated because plaintiffs failed to submit evidence demonstrating a concrete controversy over the Offset Provision's constitutionality.

2.    Whether, assuming the district court had jurisdiction, its judgment should be reversed on the merits.

## STATEMENT OF THE CASE

### A.     Statutory Background

In the American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 Stat. 4, Congress created a Coronavirus State Fiscal Recovery Fund.  42 U.S.C. § 802.  The Fund provides nearly $200 billion in new grants to help States and the District of Columbia mitigate the fiscal effects of the COVID-19 pandemic.  *Id.* § 802(a)(1); *see id.* § 802(b)(3)(A).  Section 802 allows States to use Fiscal Recovery Funds to cover broadly defined categories of costs incurred through 2024, including to provide assistance to households, businesses, and industries affected by the pandemic; to provide premium pay to workers performing essential work during the pandemic; to pay for state government services to the extent of revenue losses due to the pandemic; and to make necessary investments in water, sewer, or broadband infrastructure.  *Id.* § 802(c)(1).

In addition to identifying the permissible uses of Fiscal Recovery Funds, § 802 places two "[f]urther restriction[s]" on the use of the funds.  42 U.S.C. § 802(c)(2).  One is that a State may not deposit the funds into a pension fund.  *Id.* § 802(c)(2)(B).  The other, which is at issue here, is that a State "shall not use the funds … to either directly or indirectly offset a reduction in the net tax revenue of such State" resulting from a change in state law during a covered time period.  *Id.* § 802(c)(2)(A).[1]

---

[1] The covered period began on March 3, 2021 and ends on the last day of the state fiscal year "in which all funds received by the State … have been expended or returned to, or recovered by," the Treasury Department.  42 U.S.C. § 802(g)(1).

The statute provides that, to receive a federal grant, a State must submit "a certification" that it "requires the payment … to carry out the activities specified in" § 802(c) and that it "will use any payment … in compliance with" that provision. 42 U.S.C. § 802(d)(1). If a State uses its Fiscal Recovery Funds for impermissible purposes, it may be required to repay an amount equal to the funds misused. *Id.* § 802(e).

## B.     Implementing Regulations

Congress authorized the Treasury Department "to issue such regulations as may be necessary or appropriate to carry out" § 802, which established the Fiscal Recovery Fund. 42 U.S.C. § 802(f). In May 2021, the Department issued an interim final rule detailing how it would implement the statutory conditions on the use of Fiscal Recovery Funds, including the Offset Provision. *Coronavirus State and Local Fiscal Recovery Funds*, 86 Fed. Reg. 26,786 (May 17, 2021); *see id.* at 26,815. In January 2022, the Department issued a final rule implementing the statutory conditions. *Coronavirus State and Local Fiscal Recovery Funds*, 87 Fed. Reg. 4338 (Jan. 27, 2022); *see id.* at 4423-4429.

The regulations describe the circumstances in which a state tax cut may implicate the Offset Provision. First, because the Offset Provision applies only when a State experiences a reduction in net tax revenue, it is not implicated if the State cuts taxes but maintains its prior level of state tax revenue as the result of economic growth. *See* 87 Fed. Reg. at 4427 ("Safe harbor"). Second, because the Offset Provision restricts only the use of the new federal funds, it is not implicated if a State uses its own funds to offset a reduction in its net tax revenue, by cutting its expenditures of state funds in a

"department, agency, or authority" where it is not spending Fiscal Recovery Funds. *See id.* ("Covered spending cuts"). As the rule explains, if a State were to cut its spending of state funds in a "department, agency, or authority" in which it *is* using Fiscal Recovery Funds, and if it were to use the saved state money to pay for a tax cut, then it would be "indirectly" using Fiscal Recovery Funds to pay for the tax cut. *Id.* at 4427-4428. But as long as the State can pay for a tax cut with its own funds, it is free to cut taxes. The regulations thus clarify that "[t]he Offset Restriction simply prohibits states from cutting taxes in a way that reduces net revenue more than a de minimis amount and then failing to account for that reduction through … sources" other than Fiscal Recovery Funds, "such as through organic economic growth, increases in revenue from other sources, or spending cuts in" agencies where the State is not spending Fiscal Recovery Funds. *Missouri v. Yellen*, 39 F.4th 1063, 1070 (8th Cir. 2022).

### C.     This Action

Texas, Mississippi, and Louisiana brought this action in May 2021, shortly after the enactment of the American Rescue Plan Act. The premise of their suit is that the Offset Provision—which plaintiffs dub the "Tax Mandate"—is not merely a restriction on the use of the new federal funds. They claim that it instead "prohibits the Plaintiff States from eliminating taxes, reducing tax rates, or increasing tax credits" or adopting "enforcement policies regarding taxes which would lead to reduced tax revenues." ROA.13 ¶ 7. Based on that premise, the complaint alleged (as relevant here) that the

Offset Provision is unconstitutionally coercive and violates anti-commandeering principles. ROA.21-25 ¶¶ 53-79.

The district court denied the federal government's motion to dismiss for lack of jurisdiction and entered summary judgment for plaintiffs. Its ruling rested on the assumption that the Offset Provision "prohibits tax cuts altogether." *Texas v. Yellen*, 2022 WL 1063088, at *6 (N.D. Tex. Apr. 8, 2022). The court declared that although the Offset Provision is "styled as a '[f]urther restriction on use of funds,' in reality" it "'creates an independent obligation on States accepting [American Rescue Plan Act] funds to not reduce their own tax revenues.'" *Id.* at *4. On the basis of that premise, the court held that the provision is unconstitutionally coercive and violates anti-commandeering principles.[2]

## SUMMARY OF ARGUMENT

The district court's judgment rests on an incorrect reading of the Offset Provision. As the Eighth Circuit recently explained, the Offset Provision does not prohibit States from adopting tax cuts; it simply requires that a State offset revenue losses from tax cuts by using its own revenue sources, including revenue increases from organic growth, rather than Fiscal Recovery Funds. *Missouri v. Yellen*, 39 F.4th 1063, 1069-1070

---

[2] The district court did not reach plaintiffs' other constitutional challenges to the Offset Provision, and it dismissed one of plaintiffs' claims (asserting a violation of equal-sovereignty principles) as moot given the relief it had entered. 2022 WL 1063088, at *6.

(8th Cir. 2022). If there were any doubt as to that interpretation, the canon of constitutional avoidance would require the Court to adopt it, to the extent constitutional concerns would arise if the provision actually forbade tax cuts. It is a court's duty to preserve the work of the Nation's elected representatives. *See, e.g.*, *Cheek v. United States*, 498 U.S. 192, 203 (1991) ("It is common ground that this Court, where possible, interprets congressional enactments so as to avoid raising serious constitutional questions.").

Plaintiffs failed to demonstrate a concrete controversy over the constitutionality of the Offset Provision as correctly construed. At the summary-judgment stage, it was plaintiffs' burden to submit evidence establishing jurisdiction. But plaintiffs submitted no evidence that the Offset Provision has actually hindered their ability to determine policies for raising and spending state funds. Nor did plaintiffs establish any credible threat that the Offset Provision will be enforced against them. They submitted no evidence that tax cuts they have enacted or imminently plan to enact will result in a reduction in their net tax revenue, or that that they intended to use Fiscal Recovery Funds (rather than spending cuts or economic growth) to offset any such shortfall.

Assuming the Court reaches the merits, there is no plausible contention that the Offset Provision is unconstitutionally coercive or violates the anti-commandeering doctrine. The statute simply specifies the permissible and impermissible uses of the new federal funds that Congress provided. A State has no greater right to ignore the two statutory restrictions on the use of these new federal funds—*i.e.*, restrictions against depositing the money in a pension fund or using it to offset a reduction in net tax

revenue—than to ignore Congress's specification of the permissible uses of the funds, such as using the money to make necessary investments in certain infrastructure. Any contrary argument is foreclosed by *National Federation of Independent Business v. Sebelius* (*NFIB*), 567 U.S. 519 (2012). There, although the Court held that Congress could not make a State's *preexisting* Medicaid grant contingent on the expansion of eligibility for Medicaid, the Court unanimously recognized Congress's prerogative to make the Affordable Care Act's *new* federal funds—totaling hundreds of billions of dollars—contingent on that expansion. Thus, if this Court reaches the merits, it should reverse the judgment of the district court.

## STANDARD OF REVIEW

The district court's permanent injunction presents issues of law that this Court reviews de novo. *Med-Cert Home Care, LLC v. Becerra*, 19 F.4th 828, 830 (5th Cir. 2021).

## ARGUMENT

### I. PLAINTIFFS FAILED TO SUBMIT EVIDENCE DEMONSTRATING A CONCRETE CONTROVERSY OVER THE OFFSET PROVISION'S CONSTITUTIONALITY

The district court's summary-judgment ruling rested on the premise that the Offset Provision "prohibits tax cuts altogether." *Texas v. Yellen*, 2022 WL 1063088, at *6 (N.D. Tex. Apr. 8, 2022). The court declared that although the Offset Provision is "styled as a '[f]urther restriction on use of funds,' in reality" it "'creates an independent obligation on States accepting [American Rescue Plan Act] funds to not reduce their own tax revenues.'" *Id.* at *4. Based on that premise, the court enjoined enforcement

of the Offset Provision on the theory that it is unconstitutionally coercive and violates anti-commandeering principles.

That injunction rests on an incorrect reading of the Offset Provision, and there is no concrete controversy over the provision as correctly construed. As the Eighth Circuit recently explained in affirming the dismissal of Missouri's similar challenge for lack of jurisdiction, "[t]he Offset Restriction simply prohibits states from cutting taxes in a way that reduces net revenue more than a de minimis amount and then failing to account for that reduction through … sources" other than Fiscal Recovery Funds, "such as through organic economic growth, increases in revenue from other sources, or spending cuts in" agencies where the State is not spending Fiscal Recovery Funds. *Missouri v. Yellen*, 39 F.4th 1063, 1070 (8th Cir. 2022); *see also* 87 Fed. Reg. at 4427-4428 (explaining that a State would be using Fiscal Recovery Funds to "indirectly" offset a reduction in net tax revenue if the State were to use Fiscal Recovery Funds to replace its own spending in a given "department, agency, or authority," and use the saved state money to pay for a tax cut).

Assuming *arguendo* that plaintiffs might once have feared that the Treasury Department would adopt a broader interpretation, that fear was put to rest by the regulations that the Treasury Department issued. As this Court has explained, in affirming a district court's finding that it lacked jurisdiction, the Court "generally defer[s] to a narrowing construction by government officials that avoids a finding of unconstitutionality." *Moore v. Brown*, 868 F.3d 398, 407 n.3 (5th Cir. 2017) (per curiam). And even absent

the Treasury Department's construction, it would have been appropriate to construe the Offset Provision narrowly in order to avoid any serious constitutional issues that would have arisen from a different construction.  *See, e.g.*, *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018) ("When 'a serious doubt' is raised about the constitutionality of an act of Congress, 'it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.'" (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932))); *Cheek v. United States*, 498 U.S. 192, 203 (1991) ("It is common ground that this Court, where possible, interprets congressional enactments so as to avoid raising serious constitutional questions."); *see also Davidson v. Georgia-Pacific, LLC*, 819 F.3d 758, 763 (5th Cir. 2016) (holding that "[t]he duty to avoid constitutional difficulties when interpreting a statute warrant[ed] a narrow reading of" a statutory provision).

As in the *Missouri* case, plaintiffs here sought "a quintessential advisory opinion": they challenged "a hypothetical interpretation of the Offset Restriction that the Secretary [of the Treasury] has explicitly disclaimed, without alleging any concrete, imminent injury from the Secretary's actual interpretation."  39 F.4th at 1070.  At the summary-judgment stage, it was plaintiffs' burden to submit evidence demonstrating a concrete controversy.  But plaintiffs submitted no evidence that the Offset Provision has actually hindered their ability to determine policies for raising and spending state funds.  To the contrary, they submitted evidence showing that Texas had in fact enacted tax cuts after accepting Fiscal Recovery Funds and that Mississippi's governor and legislature were

- 9 -

considering tax-cut proposals. *See* ROA.201 (plaintiffs' brief in opposition to the government's motion to dismiss); *see also* ROA.415-418; ROA.420; ROA.423-424; ROA.429-437; ROA.439; ROA.442-447; ROA.449; ROA.452-457; ROA.459; ROA.464; ROA.468; ROA.471-482; ROA.484 (evidence cited in plaintiffs' brief).

Moreover, plaintiffs submitted no evidence showing a credible threat that the Treasury Department will take action to enforce the Offset Provision against them. They submitted no evidence that Texas will experience a reduction in its net tax revenue as a consequence of the tax cuts it has made: Texas (like other States) has seen significant revenue growth in the past several years. And they submitted no evidence showing that they lack sufficient state funds to offset any (hypothetical) reductions in their net tax revenue from any tax cuts they have enacted or imminently plan to enact. Accordingly, the judgment of the district court should be vacated for lack of jurisdiction.[3]

---

[3] Although the Ninth Circuit found jurisdiction in another case challenging the Offset Provision, that case (unlike this one) had been resolved at the pleading stage, and the court of appeals simply accepted as true the allegations of the complaint. *See Arizona v. Yellen*, 34 F.4th 841, 849 (9th Cir. 2022). The court thus found that Arizona had established jurisdiction by merely "*alleg*[*ing*] … harms to its ability to exercise its sovereign prerogatives," *id.* at 852 (emphasis added), as a consequence of the Offset Provision, as well as by alleging a credible threat of recoupment due to a large tax cut it had enacted. Judge Ryan Nelson disagreed with part of the majority's reasoning in a concurring opinion that anticipated the Eighth Circuit's holding. He explained that "[a] tax cut, on its own, does not fall within the Offset Provision's ambit," and thus that a State could show a reasonable fear of enforcement of the Offset Provision based on a tax cut only if—in addition to showing that it had cut taxes—it also showed that the "tax cut [would] not be offset by macroeconomic growth" or in another permissible fashion (*i.e.*, an increase in other state taxes or a "cut[] in spending" in an area where the State was not spending Fiscal Recovery Funds). *Id.* at 856 (R. Nelson, J., concurring).

## II.   THE OFFSET PROVISION IS NOT IMPERMISSIBLY COERCIVE AND DOES NOT VIOLATE THE ANTI-COMMANDEERING DOCTRINE

As explained above, the district court's injunction rests on the incorrect premise that the Offset Provision "prohibits tax cuts altogether." 2022 WL 1063088, at *6. That premise is wrong for the reasons already explained. And as correctly construed, the Offset Provision falls easily within Congress's power to restrict the use of new federal grants.

The Supreme Court has repeatedly "upheld Congress's authority to condition the receipt of funds on the States' complying with restrictions on the use of those funds, because that is the means by which Congress ensures that the funds are spent according to its view of the 'general Welfare.'" *National Fed'n of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519, 580 (2012) (plurality opinion). Congress possesses that authority even when the new federal grants are very large, as illustrated by *NFIB*. There, a majority of the Justices held that Congress could not make a State's *preexisting* Medicaid funding contingent on the State's agreement to extend coverage to all low-income adults—an expansion that the majority regarded as a new program. *See id.* at 580-585 (plurality opinion); *id.* at 681-689 (joint dissent). But a different majority upheld the same requirement as a condition on the *new* funds offered by the Affordable Care Act, which totaled $100 billion per year. *See id.* at 576, 585-586 (Roberts, C.J., joined by Breyer, J., and Kagan, J.) (emphasizing that "[n]othing in our opinion precludes Congress from offering funds under the Affordable Care Act to expand the availability of

- 11 -

health care, and requiring that States accepting such funds comply with the conditions on their use"); *id.* at 646 (Ginsburg, J., joined by Sotomayor, J., agreeing with this aspect of the plurality opinion). Even the dissenting Justices agreed that "Congress could have made just the *new* funding provided under the [Affordable Care Act] contingent on acceptance of the terms of the Medicaid Expansion"; they simply disagreed with the majority about whether that funding condition was severable. *Id.* at 687-688 (joint dissent).

Even if *NFIB* had not foreclosed the argument, moreover, common sense refutes the notion that Congress loses its power to determine how grants will be used if the grants exceed a certain (unspecified) size. For example, if Congress offered States a multi-billion-dollar grant to build bridges and roads, a State could not seek to invalidate that condition and use the grant for other purposes simply because, given its present degree of economic hardship, it could not reasonably turn down the funds. There is no generosity exception to the rule that "[t]he power to keep a watchful eye on expenditures … is bound up with congressional authority to spend in the first place," *Sabri v. United States*, 541 U.S. 600, 608 (2004).

Moreover, the Supreme Court and this Court have never employed a coercion analysis to a condition, like this one, on the *use* of federal funds. In *South Dakota v. Dole*, 483 U.S. 203 (1987), the Supreme Court applied a coercion analysis to a condition on federal highway funds (which the Court upheld) because "the condition was *not* a restriction on how the highway funds … were to be used," *NFIB*, 567 U.S. at 580 (plurality

opinion) (emphasis added); rather, it required States accepting highway funds to do something else (impose a minimum drinking age) as a condition of receiving the full amount of funds. This Court has recognized the same distinction between a "restriction on how a state uses federal funds," which "is constitutional because it ensures that the funds are spent according to [Congress's] view of the 'general Welfare,'" and "conditions that do not directly 'govern the use of the funds' and instead attempt to 'pressur[e] the States to accept policy changes,'" which are subject to "the coercion inquiry." *Gruver v. Louisiana Bd. of Supervisors for the La. State Univ. Agric. & Mech. Coll.*, 959 F.3d 178, 183 (5th Cir. 2020) (quotation marks omitted); *see also Mississippi Comm'n on Envtl. Quality v. EPA*, 790 F.3d 138, 179 (D.C. Cir. 2015) (per curiam) (recognizing a similar distinction). Because the Offset Provision is simply a "restriction on use of [federal] funds," 42 U.S.C. § 802(c)(2) (heading), it "is constitutional," *Gruver*, 959 F.3d at 183. Rather than coercing or commandeering a State's use of its *own* funds; it governs only the State's use of newly appropriated federal funds.

The operation of the Offset Provision should be familiar to any State that has a balanced-budget requirement, as all plaintiffs do. Such States routinely encounter the need to "offset" any negative revenue effects of a tax cut in order to balance their books. They can do so with either an increase in state revenue, whether from economic growth or from increases to other taxes, or with a reduction in state spending. The sole effect of the Offset Provision is that, when States determine how to balance the negative revenue effects of a tax cut on their budgets, they may not use the federal Fiscal

Recovery Funds funds "as part of that balancing process." *Missouri*, 39 F.4th at 1070 n.6. Rather, they must be able to offset any negative revenue effect of a state tax cut with state revenue increases or state spending reductions alone.

In this regard, the Offset Provision resembles the maintenance-of-effort requirements that are a longstanding feature of Spending Clause legislation: It prevents States from choosing to eliminate a source of non-federal revenue ordinarily used to pay for a state expenditure, replacing that source with Fiscal Recovery Funds, and using the saved state funds to pay for a tax cut. *See, e.g.*, *Bennett v. Kentucky Dep't of Educ.*, 470 U.S. 656, 659 (1985) (Title I of the Elementary and Secondary Education Act "from the outset prohibited the use of federal grants merely to replace state and local expenditures"); *Mayhew v. Burwell*, 772 F.3d 80 (1st Cir. 2014) (upholding Medicaid maintenance-of-effort requirement); *South Carolina Dep't of Educ. v. Duncan*, 714 F.3d 249, 252 (4th Cir. 2013) (describing maintenance-of-effort requirement in the Individuals with Disabilities Education Act). The district court noted that the Offset Provision gives States *greater* flexibility than typical maintenance-of-effort provisions, 2022 WL 1063088, at *6, but failed to explain why that makes the provision constitutionally problematic, aside from the unsupported view that the provision "prevents tax cuts altogether," *id.*

In short, because the Offset Provision simply specifies the terms on which States may use the new allocation of Fiscal Recovery Funds, it does not implicate the coercion or commandeering doctrines.

## CONCLUSION

The district court's judgment should be reversed.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney*
*General*

CHAD E. MEACHAM
*United States Attorney*

MARK B. STERN
ALISA B. KLEIN

*/s/ Daniel Winik*
DANIEL WINIK
*Attorneys, Appellate Staff*
*Civil Division, Room 7245*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-8849*
*daniel.l.winik@usdoj.gov*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 3,804 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in 14-point Garamond, a proportionally spaced typeface.

*/s/ Daniel Winik*
Daniel Winik

**ADDENDUM**

# TABLE OF CONTENTS

42 U.S.C. § 802 ...................................................................................................................A1

**42 U.S.C. § 802**

**§ 802. Coronavirus State Fiscal Recovery Fund**

(a) Appropriation

In addition to amounts otherwise available, there is appropriated for fiscal year 2021, out of any money in the Treasury not otherwise appropriated—

(1) $219,800,000,000, to remain available through December 31, 2024, for making payments under this section to States, territories, and Tribal governments to mitigate the fiscal effects stemming from the public health emergency with respect to the Coronavirus Disease (COVID-19)..

(b) Authority to make payments

…

(3) Payments to each of the 50 States and the District of Columbia

(A) In general

The Secretary shall reserve $195,300,000,000 of the amount appropriated under subsection (a)(1) to make payments to each of the 50 States and the District of Columbia.

…

(6) Timing

(A) States and territories

(i) In general

To the extent practicable, subject to clause (ii), with respect to each State and territory allocated a payment under this subsection, the Secretary shall make the payment required for the State or territory not later than 60 days after the date on which the certification required under subsection (d)(1) is provided to the Secretary.

…

(c) Requirements

(1) Use of funds

Subject to paragraph (2), and except as provided in paragraph (3), a State, territory, or Tribal government shall only use the funds provided under a payment made under this section, or transferred pursuant to section 803(c)(4) of this title, to cover costs incurred by the State, territory, or Tribal government, by December 31, 2024—

(A) to respond to the public health emergency with respect to the Coronavirus Disease 2019 (COVID-19) or its negative economic impacts, including assistance to

households, small businesses, and nonprofits, or aid to impacted industries such as tourism, travel, and hospitality;

(B) to respond to workers performing essential work during the COVID-19 public health emergency by providing premium pay to eligible workers of the State, territory, or Tribal government that are performing such essential work, or by providing grants to eligible employers that have eligible workers who perform essential work;

(C) for the provision of government services to the extent of the reduction in revenue of such State, territory, or Tribal government due to the COVID-19 public health emergency relative to revenues collected in the most recent full fiscal year of the State, territory, or Tribal government prior to the emergency; or

(D) to make necessary investments in water, sewer, or broadband infrastructure.

(2) Further restriction on use of funds

(A) In general

A State or territory shall not use the funds provided under this section or transferred pursuant to section 803(c)(4) of this title to either directly or indirectly offset a reduction in the net tax revenue of such State or territory resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase.

(B) Pension funds

No State or territory may use funds made available under this section for deposit into any pension fund.

…

(d) Certifications and reports

(1) In general

In order for a State or territory to receive a payment under this section, or a transfer of funds under section 803(c)(4) of this title, the State or territory shall provide the Secretary with a certification, signed by an authorized officer of such State or territory, that such State or territory requires the payment or transfer to carry out the activities specified in subsection (c) of this section and will use any payment under this section, or transfer of funds under section 803(c)(4) of this title, in compliance with subsection (c) of this section.

(2) Reporting

Any State, territory, or Tribal government receiving a payment under this section shall provide to the Secretary periodic reports providing a detailed accounting of—

(A) the uses of funds by such State, territory, or Tribal government, including, in the case of a State or a territory, all modifications to the State's or territory's tax revenue sources during the covered period; and

(B) such other information as the Secretary may require for the administration of this section.

(e) Recoupment

Any State, territory, or Tribal government that has failed to comply with subsection (c) shall be required to repay to the Secretary an amount equal to the amount of funds used in violation of such subsection, provided that, in the case of a violation of sub-section (c)(2)(A), the amount the State or territory shall be required to repay shall be lesser of—

(1) the amount of the applicable reduction to net tax revenue attributable to such violation; and

(2) the amount of funds received by such State or territory pursuant to a payment made under this section or a transfer made under section 803(c)(4) of this title.

(f) Regulations

The Secretary shall have the authority to issue such regulations as may be necessary or appropriate to carry out this section.

(g) Definitions

In this section:

(1) Covered period

The term "covered period" means, with respect to a State, territory, or Tribal govern-ment, the period that--

(A) begins on March 3, 2021; and

(B) ends on the last day of the fiscal year of such State, territory, or Tribal government in which all funds received by the State, territory, or Tribal government from a payment made under this section or a transfer made under section 803(c)(4) of this title have been expended or returned to, or recovered by, the Secretary.

…